SANG J. PARK, SBN 232956
sang@park-lawyers.com
SOOK WON, SBN 224304
sook@park-lawyers.com
PARK APC
5670 Wilshire Blvd., Suite 1800
Los Angeles, California 90036
Telephone:   (310) 627-2964
Fax:          (310) 362-8279

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Melissa Keller, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>Adventist Health System West dba Adventist Health; Adventist Health Employee Medical Plan– Engaged!; Administrative Committee; Blue Zones, LLC; and DOES 1 to 10,<br><br>Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Melissa Keller, individually, and on behalf of all those similarly situated, alleges:

## **INTRODUCTION**

1.      In early-Covid 2020, Defendant Adventist Health System/West dba Adventist Health ("AHW") laid off Plaintiff and thousands of employees.

2.      Given the pandemic, the Department of Labor ("The DOL"), extended deadlines to continue coverage under employer-sponsored health plans, pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). Congress later enacted legislation requiring employers to pay premiums for such extended coverage under COBRA.

3.      States with mini-COBRA statutes, including California, adopted these enhanced protections and rights under COBRA.

4.      AHW did not comply with COBRA or Cal-COBRA.  AHW's employee-funded health plan, the Adventist Health Employee Medical Plan – Engaged! (the "Plan") likewise declined to comply.

5.      AHW, the Plan and its administrator, Administrative Committee ("Administrator") claim that the Plan is exempt from the Employee Retirement Income Security Act of 1974 ("ERISA") and COBRA, as it is a church plan.

6.      AHW, however, is not maintained by a church.  It is a $5 Billion enterprise, funded by Medicare and Medicaid, not by the Seventh-day Adventist Church.

7.      In 2020, AHW announced its "transformative strategy" to invest $1B in the trillion-dollar health and wellness industry.  AHW partners with Oprah Winfrey, Dr. Oz and Miami developers. The $100M med-spas, mental health apps and web platforms, the future core of its business, is not affiliated with the Seventh-day Adventist Church, no matter what their websites claim.

8.      AHW's move from low-income hospitals to $100M "wellness spas" is legal, but it moves AHW outside ERISA's church plan exemption

9.      Since 2018, AHW has invested up to $1B in private for-profit companies and new technologies.  This includes start-ups, apps, web platforms.

10.     The Plan holds hundreds of millions of dollars in trust, funded by AHW's 34,000 employees.  The Plan has used plan assets to purchase each service or technology which AHW has invested in– defraying AHW's risks and cost of investment.

11.     AHW has at least two other health plans: (1.) the Adventist Health and Rideout Employee Medical Plan – Engaged! (includes Mendocino) ("Rideout Plan"); and (2) the Adventist Health Delano Employee Medical Plan – Engaged! ("Delano").

12.     These plans are subject to ERISA as "non-church plans," according to plan documents.  Even under ERISA, these plans' assets have been used to buy AHW-owned services and technology.

13.     This is because AHW and its plans require AHW employees to use AHW services and technology as a condition of employment, coverage or pre-authorization under the Plan.

14.     With this business model, AHW executives gain undisclosed stock options, phantom stocks, dividends, pension benefits and bonuses from the for-profit subsidiaries and investments.

15.     These transactions would not be possible under ERISA, which requires plan assets to be used for the exclusive benefit of participants. These transactions are prohibited transactions with a party in interest.

16.     These transactions are barred as they pose conflicts of interest, especially if executive compensation flows from the transactions approved by company executives and Plan fiduciaries.

17.     Undisclosed executive compensation is the motor driving AHW's for-profit endeavors.  Even with requisite disclosures, AHW approved $30M in executive compensation in 2019.

18.     Ten AHW executives earned between 1.1M to 4.4M, while fifteen AHW executives earned $700k to $990k.

19.     With these facts, the Plan is not a church plan. The Plan is being administered to confer benefits to AHW, AHW executives, and AHW affiliates. The Plan does not meet the requisite principal-purpose organization requirement, which requires the plan's principal purpose to be the administration of health benefits to church employees.

20.     Plaintiff has been harmed by Defendants' clear violations of ERISA, and Cal-COBRA.  Plaintiff hereby seeks declaratory relief and damages for herself and all others who were ill-served thereby.

## JURISDICTION AND VENUE

21.     AHW, the Plan and the Plan's administrator's main offices are all located at the company headquarters in Roseville, California.  Venue of this action lies in the Eastern District of California pursuant to ERISA section 502(e)(2), 29 USC § 1132(e)(1) because Roseville, California is where the Plan was administered, where Defendants' breaches took place, and where Defendants reside.

22.     This Court has jurisdiction over this action pursuant to ERISA 52(e)(1), 29 U.S.C. § 1132(e)(1).

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 as these state law claims are so related to the other claims herein that they form part of the same case or controversy.

# THE PARTIES

24.     Plaintiff worked for AHW as a RN Manager.

25.     Defendant AHW is a 501(c)(3) non-profit organized under California law.

26.     AHW owns and operates "more than 20 hospitals, 250 clinics and 4,500 providers."[1]  And AHW employs 34,000 employees in California, Washington, Oregon and Hawaii.

27.     The Plan is an employee benefit plan within the meaning of ERISA section 3(3), 29 U.S.C. § 1002(3), subject to the provisions of Title 1 of ERISA pursuant to ERISA section 4(a), 29 U.S.C. § 1003(a).

28.     The Plan is administered by an Administrative Committee, "appointed by the Board of Directors of Adventist Health System/West."

29.     AHW is the employer responsible for maintaining the Plan and is thus the plan sponsor as defined in ERISA section 3(16)(B), 29 U.S.C. § 1002 (16)(B).

## Fiduciaries and Parties in Interest

30.     At all relevant times, AHW was and is the Trustee of the Plan; a fiduciary of the Plan within the meaning of ERISA section 3(21)(A)(i) and (iii), 29 U.S.C. §1002(2)(A)(i) and (iii); and a party in interest to the Plan within the meaning of ERISA sections 3(14)(A) and (C), 29 U.S.C. § 1002(14)(A) and (C).

31.     At all relevant times, Blue Zones, LLC, was a party in interest to the Plan within the meaning of ERISA sections 3(14)(B) and (G), 29 U.S.C. § 1002(14)(B) and (G).

---

[1] https://www.adventisthealth.org/

## FACTS

### AHW Has Three ERISA Plans

32.     The Plan states: "This Plan is … a church plan" within ERISA (3)(33).  AHW, however, has two "non-church" ERISA health plans.

33.     Rideout Memorial Hospital dba Adventist Health and Rideout ("Rideout") is an AHW hospital.  Its nurses are unionized. This plan is "subject to ERISA."  The Rideout Plan documents includes a COBRA notice, unlike the Plan.

34.     Likewise, the Delano plan also states that it is subject to ERISA.

35.     All three plans share an address, website, phone and fax number.

36.     It appears that all the plans (non-church and church) are administered by the same fiduciaries and with co-mingled funds.

37.     AHW has a 401(k) plan, also an ERISA plan.  The Adventist Health 401(k) Plan is administered by Adventist Health Retirement Committee (Non-Church).

38.     There is no justification for AHW to deem some employees as "non-church" employees and others as "church" employees.  All AHW employees work at AHW hospitals, which all purportedly follow Seventh-day Adventist Church traditions.  Either the Church Plan exemption applies – or as AHW has conceded, it does not.

### Defendants Are Not Church Plans

39.     ERISA originally defined a "church plan" as a plan "established and maintained … for its employees … by a church or by a convention or association of churches."  ERISA § 3(33)(A), 29 U.S.C. § 1002(33)(A).

40.     Defendant AHW is neither a church, nor a convention or association of churches.

41.     AHW expressly states that it is "separately owned and operated" from the Seventh-day Adventist Church.

42.     AHW's Consolidated Financial Statement states that "the obligations and liabilities of Adventist Health… are not the obligations or liabilities of the [Seventh-day Adventist] Church or any of its affiliated organizations."

43.     The Seventh-day Adventist Church does not control or manage AHW.

44.     AHW does not require its patients to be Seventh-day Adventists.

45.     Nor does AHW requires employees to be members of the Seventh-day Adventist Church.  In fact, AHW actively recruits doctors who are "members of other faiths to enhance the health of the [non-Adventist] communities we serve."[2]

46.     AHW's executives, who run the day-to-day operations, are not Seventh-day Adventist Church officials or ministers; many are not members of the Church.  AHW's CFO is not, and neither is the President of Well-Being.

47.     AHW does not pay a tithe or contribute significant monies to the Seventh-day Adventist Church.  The Church does not invest in or fund AHW.

48.     Notably, AHW is a publicly-funded healthcare system.

49.     AHW's CEO once estimated that 83% of AHW payors were from Medicare and Medicaid.

50.     The company's 2018 Consolidated Financial Report discloses that 69% of AHW's patient accounts receivables are Medicare and Medicaid.

51.     AHW aggressively pursues government reimbursements.  In 2013, AHW paid $14.1M to settle claims that it paid kick-backs to doctors in exchange for Medicare and Medicaid patient referrals to its hospital, White Memorial. [3]

---

[2] https://www.adventisthealth.org/provider-careers/about-us/

[3] https://www.justice.gov/opa/pr/adventist-health-pays-united-states-and-state-california-141-million-resolve-false-claims-act

52.     AHW also contracts with private corporations and for-profit physician groups, to maximize profits without any compunction as to religion or non-religion.

53.     In 2018, AHW formed a joint operating company with St. Joseph Health, a Catholic health system, to operate a group of hospitals in Northern California.  This proposed merger was subsequently blocked by the state Attorney General as not serving the public interest.

<u>AHW's 10-Year Plan</u>

54.     AHW is a $5 Billion enterprise, intent on moving from non-profit hospitals and clinics to venture capital.

55.     In 2020, AHW ran a PR campaign about its "10-year plan" and "transformative strategy" to invest $1B in the trillion-dollar health and wellness industry.

56.     Adventist Health CEO Scott Reiner remarked that, "Adventist Health's launch of the Well-Being Division is an important part of our 10-year transformation strategy to move from a healthcare company to a health company."

57.     True to its word, AHW has invested up to $1B in new technologies and services.

58.     In February 2020, AHW announced it bought Blue Zones LLC (a longevity and wellness company) for $78M.  The Plan bought services from Blue Zones LLC; each AHW employee was required to use them.

59.     A few months later, AHW announced its investment in Synchronous Health, Inc. (an AI Technology company) which developed a mental health app called "Karla".  AHW then deployed Karla on its employees.

60.     AHW also invested in Sharecare, Inc.  This is an Oprah Winfrey/Dr. Oz startup, once rosily forecast to have a $4B IPO.  Sharecare, a WebMD-type platform, was reported to have raised $400M from investors.

61.   In February 2021, AHW sold AH Vallejo (a 61-bed psychiatric facility) to for-profit Acadia Healthcare.  The sale was for an undisclosed sum. The California Attorney General imposed conditions on the sale to ensure that critically underserved children with mental health issues would still be served for at least ten years in this now for-profit business.

62.   Shortly thereafter, AHW formed a joint venture to lease and run a $100M wellness spa and med-center, within a $500M luxury skyscraper in Miami called Legacy Residences[4].  The joint venture hopes to serve wealthy medical tourists.

63.   A developer attorney explained the target market for the $100M med-spa joint venture to a trade publication, 'Miami has always had a medical tourism component where you have rich folks coming from Latin America or anywhere in the world to enjoy the weather while they're here getting their annual physical or getting certain procedures that they'd rather have done in the United States.' Legacy Residences will cater to those types of travelers as well as other wellness-focused clients."[5]

<u>Defendants' Use of Plan Assets Violates ERISA</u>

64.   AHW's move from hospitals to $100M "wellness spas" is legal, but it severs AHW from the ambit of the church plan exemption to ERISA.

65.   The church exemption to ERISA requires the Plan to be maintained by <u>an organization whose principal purpose is to administer or fund welfare benefits</u>.  ERISA section 3(33)(c)(i), 29 U.S.C. § 1002(3)(33).

---

[4] https://rebusinessonline.com/joint-venture-breaks-ground-on-255-room-legacy-hotel-residences-hotel-at-miami-worldcenter/

[5] https://www.constructiondive.com/news/500m-pandemic-ready-miami-skyscraper-gets-financing/616606/

66.     On information and belief, the Plan consists of hundreds of millions of dollars in trust, funded by AHW's 34,000 employees.

67.     Here, the principal purpose of the Plan is two-fold.  While the Plan administers claims and benefits, the principal purpose of the Plan under AHW's 10-year plan is as a slush-fund to invest in AHW's services and technology, and to amass Plan assets for AHW and its executives.

68.     Plan assets are being used by the Plan and its administrators to subsidize AHW's investments – and make them profitable, even if the open market does not and will not do so.

69.     And the Plan has bought every novel app and platform which AHW invested in.

70.     For example, AHW purchased the for-profit Blue Zones, LLC ("Blue Zones") – a longevity company for $78M.  AHW hired Ben Leedle, Jr. ("Leedle"), as Blue Zones' CEO.  Leedle is also the President of Well-Being at AHW.

71.     Leedle explained that AHW rolled out Blue Zones on "every single" employee of AHW. "The Well-Being Division felt it was important to start at home and launched Blue Zones at Adventist Health to… invest in the workforce of 30,000 employees."  And "The [Blue Zones] team spent time … to partner with each associate."

72.     AHW thus forced Plan participants to pay for and use its new investment technology and services - a prohibited transaction and self-dealing.

73.     AHW spun this as beneficial.  Leedle said, "We drew a bold line in the sand that said… it [Blue Zones coaching] has to start with us and our associates."

74.     The Plan also uses the "Karla" mental-health bot "that lives in your pocket or purse," sold by AHW investment, Synchronous Health, Inc.

75.     The Plan documents encourage "covered dependents" (children and partners) to use AHW's services and technology.

76.     Both plans require prior authorization.  It "is mandatory for all Plan enrollees."  The plans' documents states:

> **If you do not follow the *prior* authorization procedures set forth in the Care Management, Health Coaching and Utilization Management Prior Authorization Program section of the *Plan*, no benefits will be provided (except in the case of *emergency services*).**

77.     With this business model, AHW executives can earn stock options, phantom stocks, dividends, pension benefits and bonuses from AHW's private investments - without public disclosure or oversight.

78.     These transactions are barred under ERISA.  They are prohibited transactions with a party in interest.

79.     They are prohibited because they pose conflicts of interest, particularly when executive compensation is structured within these transactions.

80.     These transactions are a modern-day company store, with workers using their wages to pay their employer for employer-provided goods.

81.     Executive compensation is one reason why AHW is using plan assets to benefit AHW and its affiliates.  The fact that any compensation would remain undisclosed is more significant.

82.     Even with the IRS's Form 990s, which force non-profits to disclose executive compensation, in 2019, AHW was bold.  It approved $30M in executive pay.

83.     Although AHW has an 80% Medicare and Medical payor-based business, AHW executives paid themselves higher annual compensation ($4,448,122) ($2,777,038) ($2,528,851) than the CEOs of Cedars-Sinai, The Mayo Clinic, or the President of Yale.

84.   In 2019, ten AHW executives earned between 1.1M to 4.4M, while fifteen AHW executives earned $700k to $990k.

85.   Before it was terminated in 2016, AHW's raft of home-grown executives set up a "top hat" SERP retirement plan to incentivize themselves to stay put and keep earning millions of dollars each year.

86.   The plan required employer contributions equal to 60% of their annual salary for covered executives.

87.   AHW's 2019 Form 990 disclosed that the SERP was closed to new members in 2016.  Several executives retired or had their positions eliminated in 2018 and 2019.  One year later, AHW's "10-year transformative plan" to venture capital was announced, and $1B in investments earmarked to go private.

88.   Simply put, the Plan is not a church plan, given the new business model of AHW, its business partner and investments, and its transfer of millions of dollars of Plan assets to subsidize AHW's untested products and services.

89.   This 10-year plan tangibly benefits AHW and its officers and directors, who are fiduciaries and plan administrators, but it remains to be seen whether it benefits participants, who are being forced to utilize these technologies and services and forced to crowd-fund them to boot.

Defendants Violated COBRA and Cal-COBRA

90.   AHW's 34,000 employees work, in part, to secure health insurance for their families through the Plan.  Employees co-fund the Plan through premium payments, deductibles and co-pays.

91.   In early-Covid 2020, Defendant AHW laid off thousands of employees, as well as Plaintiff.

92.   Shortly after job loss, on July 31, 2020, AHW severed Plaintiff's health insurance under the Plan.

93.     Given mass layoffs, which meant families were facing a serious infectious disease without insurance, the DOL extended relief in 2020.  It gave laid-off workers and their families more time to say yes to continuing insurance coverage under their employer sponsored plan - from 60 days to one year.  This is under COBRA.

94.     Plaintiff had one year to secure coverage, but she did not know that. She did not elect continued coverage, neither did her family.  Consequently, Plaintiff was uncovered and had no insurance during a global pandemic when Covid vaccines were not yet available.  Plaintiff suffered anxiety and fear, due to her lack of health insurance and Defendants' failures to comply with COBRA.

95.     In 2021, Congress passed The American Rescue Plan Act ("American Rescue Plan").  Employers were required to pay COBRA premiums for participants who were terminated (or whose work-hours were cut) between November 1, 2019 and August 31, 2021.

96.     The American Rescue Plan also gave employees a second bite at the apple.  Laid-off workers and their families had more time to say yes to sign up for COBRA coverage, even if they had not done so before.

97.     AHW and Plan Defendant did not give Plaintiff or any former employees and their families notices of their rights under the American Rescue Plan.

98.     AHW and Plan Defendant did not give Plaintiff or any former participants notice of their rights under Cal-COBRA, which adopted the American Rescue Plan.

99.     AHW, Plan Defendant and Administrator have claimed that the Plan is exempt from ERISA and COBRA, because it is a church plan.

100.    Defendants, however, also ignored Cal-COBRA, which does not exempt church plans.

101. Plaintiff, who lives and works in California, did not get notice about her enhanced rights to coverage. Neither did thousands of former AHW's California employees.

102. The American Rescue Plan gave employers a tax credit on federal taxes for doing their part. But AHW is exempt from federal taxation. So, AHW had nothing to gain from complying with ERISA or Cal-COBRA. Covering former employees' insurance coverage would be benevolent.

103. But AHW is not a charitable hospital in the traditional or "church plan" sense. It is a health and wellness investor and a healthcare system. Defendants intentionally deprived Plan participants of COBRA notices and rights to insurance coverage and peace of mind thereunder, on the plainly erroneous assumption that the Plan is a church plan, exempt from ERISA compliance.

104. Many church plans have sought an advisory opinion from ERISA as to whether their plans qualify under the Church Plan exemption. Many former church plans have opted to comply with ERISA.

105. AHW and the Plan have never sought an advisory opinion from ERISA about whether it qualifies as a church plan, because AHW and Plan fiduciaries know that the Plan is not a *bona fide* church plan.

106. Moreover, AHW carved out two hospitals and one 401(k) fund as by separate ERISA-governed plans because it knows the church-plan exemption is inapt.

107. AHW's plan are all covered by ERISA. Defendants failed to give required COBRA notices and breached their fiduciary duties by using Plan assets to benefit parties in interest.

## CLASS ACTION ALLEGATIONS

108.   Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following class of similarly situated persons:

All participants and beneficiaries in the Adventist Health Employee Medical Plan -Engaged! who did not receive adequate notice from Defendants about their enhanced rights under COBRA, within the statute of limitations, and thus did not elect coverage.

All participants and beneficiaries in the Adventist Health Employee Medical Plan -Engaged! who did not receive adequate notice from Defendants as to their enhanced rights under Cal-COBRA, within the statute of limitations, and thus did not elect coverage.

All participants and beneficiaries in the Adventist Health Employee Medical Plan -Engaged! whose assets were used by or transferred to Plan fiduciaries for their personal interest, or whose assets were not used for the exclusive benefit of participants and beneficiaries.

All participants and beneficiaries in the Adventist Health Employee Medical Plan- Engaged! who were damaged by the Plan's prohibited transactions with service providers and affiliates of AHW.

Numerosity

109.   Plaintiff is not aware of the precise number of Class members, but this information is readily ascertainable from AHW records.  AHW employs

34,000 employees and the Plan has 30,000 or more participants.  For this reason, joinder of all Class members is impracticable.

Typicality

110.    Plaintiff's claims are typical of the Class as their claims arise from the same event and transactions, i.e., AHW and the Plan's failure to give Covid-related COBRA notices and rights.  Plaintiff's claims as to the use of plan assets for self-dealing and prohibited transactions are typical of the Class, as well.

Adequacy

111.    Plaintiff will fairly and adequately protect the interests of the Class members.  Defendants have no unique defenses against Plaintiff which would interfere with her representation of the Class, and Plaintiff has no interest antagonistic to the class.  She has retained counsel experienced in complex class action litigation and with ERISA class actions.

Commonality

112.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including but not limited to:

a.      Whether the Plan is covered by ERISA;

b.      Whether the Plan is a church plan;

c.      Whether Defendants violated ERISA by failing to file form 5500s.

d.      Whether the Plan is a group health plan within the meaning of 29 U.S.C. § 1167(1);

e.      Whether Defendants' notice complied with the requirements of 29 U.S.C. 1166(a) and 29 C.F.R. § 2590.606-4;

f.      Whether statutory penalties should be imposed against Defendant under 29 U.S.C. 1132(c)(1) for failing to comply with COBRA notice requirements, and if so, in what amount;

g.      Whether Defendants violated ERISA by failing to use plan asserts for the exclusive benefit of participants and beneficiaries, and if so, what damages are owed to the Plan and its participants and beneficiaries for such violations; and

h.      Whether Defendants violated ERISA by engaging in prohibited transactions by using or transferring plan assets in transactions with parties in interest (plan sponsor, service providers, officers and directors).

113.   Class members do not have an interest in pursuing separate individual actions against Defendant, as the amount of each Class Member's individual claim is modest as compared to the cost of individual actions.

114.   Class certification will also bar unduly duplicative litigation which may result in inconsistent judgments as to Defendants' defenses and class claims.

115.   Plaintiff will send notice to all Class Members.  The names and addresses of the Class Members are available from Defendant's records.

## FIRST CLAIM FOR RELIEF

**(Violation of 29 U.S.C. § 1166 and 29 C.F.R. § 2590.606-4, Enforced Through 29 U.S.C. § 1132)**

116.    Paragraphs 1 through 115 above are realleged and incorporated herein by reference.

117.   The Plan is a group health plan within the meaning of 29 U.S.C. § 1167(1).

118.   Plaintiff and the other members of the Class experienced a "qualifying event" as defined by 29 U.S.C. § 1163.

119.   AHW as the employer of members of the Class knew of the qualifyin event and sent Plaintiff and some but not all Class Members a brochure under Cal-COBRA.

120.   The COBRA notice that Defendant sent to Plaintiff and other Class Members violated 29 U.S.C. § 1166(a) and 29 C.F.R. § 2590.606-4 for the reasons

set forth above, for which Plaintiff brings this civil action under the authority found in 29 U.S.C. § 1132.

121.   These violations were material and willful.

## SECOND CLAIM FOR RELIEF

### (Claim for Equitable Relief Pursuant to ERISA Section 502(A)(3) Against Defendants)

122.   Paragraphs 1 through 121 above are realleged and incorporated herein by reference.

123.   ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to obtain "appropriate equitable relief . . . to enforce any provisions of this title." Pursuant to this provision, and 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks declaratory relief that the Plan is not a Church Plan within the meaning of ERISA section 3(33), 29 U.S.C. § 1002(33), and thus is subject to the provisions of ERISA.

124.   ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), also authorizes a participant or beneficiary to bring a civil action to "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

125.   Pursuant to these provisions, Plaintiff seeks orders directing Defendants to bring the Plan into compliance with ERISA.

126.   ERISA section 502(a)(2), 29 U.S.C. § 1132(2), authorizes a participant or beneficiary to bring a civil action for appropriate relief under 29 U.S.C. § 1109(a), against a fiduciary "who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries" and the fiduciary "shall be personally liable to make good to such plan any losses to the plan resulting from

each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate." ERISA § 409(a), 29 U.S.C. § 1109(a).

127.   Because the operation of the Plan as a non-ERISA Plan was a breach of Defendants' fiduciary duties, Defendants breached their fiduciary duties and Plaintiffs also seek Plan-wide equitable and remedial relief under ERISA section 502(a)(2).

128.   As the Plan is not a church plan within the meaning of ERISA section 3(33), 29 U.S.C. § 1002(33), and meets the definition of a health plan under ERISA, the Plan should be declared to be an ERISA-covered health plan, and Defendants should be ordered to bring the Plan into compliance with ERISA, including by remedying the violations set forth herein.

## THIRD CLAIM FOR RELIEF

**(Claim for Violation of ERISA's Mandatory Reporting and Disclosure Provisions Against Defendant AHW, or in the alternative, the Committee Defendant)**

129.   Paragraphs 1 through 128 above are realleged and incorporated herein by reference.

130.   Since the Plan's inception, Defendants have failed to provide Plaintiff or any member of the Class with a Summary Plan Description with respect to the Plan that meets the requirements of ERISA section 102, 29 U.S.C. § 1022.

131.   Because Defendants have been the Plan Administrator of the Plan at all relevant times, it violated ERISA section 104, 29 U.S.C. § 1024, by failing to provide Plaintiff and members of the Class with adequate Summary Plan Descriptions.

132.   Defendants also, at all relevant times, violated ERISA section 104(a), 29 U.S.C. § 1024(a), by failing to file annual reports with the Secretary of Labor in compliance with ERISA section 103, 29 U.S.C. § 1023, or Form 5500s that the Secretary has approved as an alternate method of compliance with ERISA section 103, 29 U.S.C. § 1023.

## FOURTH CLAIM FOR RELIEF

**(Disloyal Imprudent and Prohibited Transactions Between the Plan and Plan Service Providers and Plan Fiduciaries Blue Zone and AHW)**

133.   Paragraphs 1 through 132 above are realleged and incorporated herein by reference.

134.   ERISA section 404(a)(1), 29 U.S.C. § 1104(a)(1) requires plan fiduciaries to act "solely in the interest" of plan participants and beneficiaries.

135.   The fiduciary must act for the "exclusive purpose" of providing benefits to plan participants.  29 U.S.C. §1104(a)(1)(A).

136.   The fiduciary has a duty of prudence to act with the "care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. §1004(a)(1)(B).

137.   ERISA section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) prohibits fiduciaries from causing plans to engage in transactions that they know or should know constitute direct or indirect transfers of the Plans' assets to, or use of the Plans' assets by or for the benefit of, parties in interest.

138.   ERISA section 406(b), 29 U.S.C. § 1106(b) prohibits fiduciary self-dealing.  A fiduciary shall not "deal with the assets of the plan in his own interest or for his own account."  29 U.S.C. § 1106(b)(1).

139.   Nor shall a fiduciary "act in any transaction involving the plan on behalf of a party whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries."  29 U.S.C. § 1106(b)(2).

140.   A fiduciary shall not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  29 U.S.C. § 1106(b)(3).

141.   At all relevant times, AHW's executives and service providers had a conflict of interest.  They stood to profit from the Plan's purchase and/or use of AHW's products and services.  These include Blue Zones, LLC; Sharecare, Inc.; and Synchronous Health, Inc.

142.   AHW's executives and Plan fiduciaries used Plan assets to purchase products and services, which AHW and its affiliates had financial interests in and would personally benefit from.

143.   AHW executives and Plan fiduciaries then drafted Plan documents requiring participants and beneficiaries to use its investments as a condition of employment, coverage, or pre-authorization for health benefits.

144.   AHW and Plan fiduciaries administered the plan and its claims and benefits to force participants and beneficiaries to purchase or use products and services which AHW and its executives have a financial interest in promoting or selling.

145.   On information and belief, these transactions were not for fair market value.  And the primary purpose of these transactions was to transfer plan assets to AHW and others to benefit these parties in interest.  The primary purpose of these transactions was not for the exclusive benefit of participants and beneficiaries.

146.   By causing the Plan to engage in these transactions, in which a fiduciary to the Plan dealt with the plan assets in his own interest, Defendants violated ERISA.

147.   As a direct and proximate result of these breaches of fiduciary duty, the Plan and its participants have suffered losses for which Defendants are jointly and severally liable pursuant to ERISA section 409, 29 U.S.C. § 1109; ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2); and ERISA section 502(a)(5), 29 U.S.C. § 1132(a)(5).

## **FIFTH CLAIM FOR RELIEF**
### **(Co-Fiduciary Liability)**

148.   Paragraphs 1 through 147 above are realleged and incorporated herein by reference.

149.   Pursuant to ERISA sections 405(a)(1),(2) and (3), 29 U.S.C. 1105(a)(1),(2) and (3), each DOE Defendant, as a named or de facto fiduciary, knew of, knowingly participated in, and enabled the breaches of fiduciary duty committed by each of the other fiduciaries set forth above.

## **SIXTH CLAIM FOR RELIEF**
### **Breach of Common Law Fiduciary Duty Against Defendants Herein**

150.   Paragraphs 1 through 149 above are realleged and incorporated herein by reference.

151.   The Plan assets are held in trust.  Plaintiff and other Class members are beneficiaries of the trust.

152.   AHW, the Plan and Administrator (and named fiduciaries) owed Plaintiff and Class members a duty of undivided loyalty to exclusively benefit participants and beneficiaries.

153.   By using and transferring plan assets for their personal gain, and by coercing participants to use AHW's products and services, Defendants breached their fiduciary duties of loyalty and prudence.

154.   Plaintiffs seek monetary damages and injunctive relief accordingly.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief as follows:

a.  Designating Plaintiff's counsel as counsel for the Class;

b.  Issuing proper notice to the Class at Defendants' expense;

c.  Entering a Declaratory Judgement declaring that the AHW Health Plan as an ERISA-covered health plan, and Defendants should be ordered to bring the Plan into compliance with ERISA, including by remedying the violations set forth above;

d.  Declaring that the COBRA notice sent by Defendant to Plaintiff and other Class Members violated 29 U.S.C. § 1166(a) and 29 C.F.R. § 2590.606-4;

e.  Awarding appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3), including but not limited to an order enjoining Defendant from continuing to use its deficient COBRA notice and requiring Defendant to send corrective notices;

f.  Awarding statutory penalties to the Class pursuant to 29 U.S.C. § 1132(c)(1) and 29 C.F.R. § 2575.502c-1 in the amount of $110.00 per day for each Class Member who was sent a defective COBRA notice by Defendant;

g.  Alternatively, nominal damages should be awarded;

h.  Awarding attorneys' fees, costs and expenses to Plaintiff's counsel as provided by 29 U.S.C. § 1132(g)(1) and other applicable law;

i.  Appointing an independent fiduciary to approve and monitor the selection and compensation of service providers to the Plan; and

j.  Granting such other and further relief, in law or equity, as this Court deems appropriate.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all triable issues.

Respectfully submitted,

Dated:  May 26, 2022                    PARK APC

By: _____
Sook Won
Attorneys for Plaintiff, Melissa Keller